NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2026 VT 20

No. 25-AP-067

| | |
|---|---|
| Ian Treadway | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windsor Unit, |
| | Civil Division |
| | |
| Green Mountain Power Corporation | March Term, 2026 |

H. Dickson Corbett, J.

John D. Willey, Jr. of Boylan Associates, P.C., Springfield, for Plaintiff-Appellant.

Andrew C. Boxer and Oliver A. Abbott of Boxer Blake & Moore PLLC, Springfield, for
  Defendant-Appellee.


PRESENT: Reiber, C.J., Eaton, Waples, Nolan and Drescher, JJ.


¶ 1.   **EATON, J.**   Plaintiff Ian Treadway appeals a civil division order granting summary judgment to defendant, Green Mountain Power (GMP). Plaintiff's suit stemmed from a severe injury incurred while trespassing at defendant's electrical substation. Consistent with Vermont's common law, the civil division granted defendant's motion for summary judgment concluding that defendant owed no duty to plaintiff, who was a trespasser. On appeal, plaintiff does not contest that Vermont's common law precludes recovery on his complaint. However, plaintiff asks this Court to adopt the attractive-nuisance doctrine outlined in the Restatement (Second) of Torts § 339 (1965) and remand for a trial. We decline to overrule our existing cases regarding the duty owed to trespassers and affirm.

¶ 2.    The following facts were uncontested for purposes of summary judgment unless otherwise noted.  In May 2013, plaintiff, then twelve, and two friends were playing on footpaths near defendant's South Street Substation in Springfield, Vermont.  After the children came to the substation, plaintiff told his friends that he intended to climb the substation fence and explore a shed that he could see nearby.

¶ 3.    The substation was enclosed by a chain-link fence with a pad-locked gate.  The fence was topped with vertical barbed wire, and, in total, stood approximately eight feet and two inches tall.  Six warning signs were also mounted along the perimeter of the fence.  The signs read: "DANGER" and "HIGH VOLTAGE KEEP OUT."  Within the substation, a large metal lattice structure supported air-break switches, in addition to lightening arrestors, and fuses for the electric lines above.  The substation also produced an audible hum of electricity.

¶ 4.    Despite the indications that this infrastructure was built with the intent to keep people out and the visible and legible warning signs to that effect, plaintiff entered the substation. The exact method of plaintiff's entry is unclear, but both parties agree that plaintiff was able to enter through a section of the gate, notwithstanding the lock.[1]  Once inside the property, plaintiff briefly explored the shed and then, in reference to the large metal lattice tower, plaintiff told his friends, "I'm going to climb it and I'm going to pee off of this thing."

¶ 5.    Plaintiff's friends attempted to dissuade plaintiff from climbing the metal lattice. First, plaintiff's friends told plaintiff that they were going to start walking away and then one later declared, "I'm going to laugh at you when you get electrocuted."  Shortly after this final warning, while plaintiff's friends were walking away, they heard a large bang and turned back to see smoke, light, and plaintiff on the ground.  Plaintiff did not remember climbing the tower, but evidence

---

[1]  The complaint explains that it is plaintiff's "memory that he . . . entered by squeezing between the halves of the locked gate" while plaintiff's friends recall plaintiff "entering by climbing through the fence at the gate [by] using the gate latch as a foothold to slip through the upper half of the gate where the barbed wire did not connect."

from the scene suggested that, when climbing the substation lattice, plaintiff either came into contact with electrified equipment or approached close enough for the electricity to arc from the equipment to him. As a result of this contact or arcing, plaintiff's clothes caught fire, and he suffered severe burns.

¶ 6. Plaintiff filed suit against defendant alleging his injuries were caused by defendant's negligence and defendant moved for summary judgment. Both parties agreed that plaintiff was a trespasser and that under Vermont's common law, "a landowner generally owes no duty of care to a trespasser" to protect them from injury caused by unsafe and dangerous conditions on the premises, "except to avoid willful or wanton misconduct." Baisley v. Missisquoi Cemetery Ass'n, 167 Vt. 473, 477, 708 A.2d 924, 926 (1998). Plaintiff conceded that, under the undisputed facts presented in plaintiff's complaint, defendant was entitled to summary judgment under that established law.[2] Plaintiff argued that the court should reconsider Vermont's approach to landowner liability to trespassers and adopt the attractive-nuisance doctrine as set forth in the Restatement (Second) of Torts § 339 (1965).

¶ 7. The attractive-nuisance doctrine would create an exception for children to the no-duty-to trespassers rule. See Restatement (Second) of Torts § 339 (1965). The doctrine recognizes the status of the child as a trespasser but imposes a duty upon a landowner in relevant circumstances, nonetheless. To succeed in a claim for attractive nuisance under the Restatement (Second) of Torts § 339 (1965), a plaintiff has the burden to establish the following five factors:

> (a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

> (b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an

---

[2] Plaintiff does not allege that any of defendant's actions or omissions were willful or wanton. See Baisley, 167 Vt. at 477, 708 A.2d at 926 ("In Vermont, a landowner generally owes no duty of care to a trespasser, except to avoid willful or wanton misconduct.").

3

unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

¶ 8.     According to plaintiff, the doctrine offers a reasonable modification to Vermont's current law to allow claims for children injured by artificial conditions that pose an unreasonable risk.  Plaintiff also alleged that he was entitled to relief under the doctrine because—aligned with the required factors therein—(a) defendant had reason to know that children were likely to trespass at its substation, (b) the substation posed an unreasonable risk of death or serious bodily injury, (c) plaintiff did not appreciate the full risk of the electrical elements of the substation, (d) the burden on defendant to rectify the issue was slight compared to the risk to the children involved, and (e) defendant maintained a fence that had a gap through with plaintiff could easily enter the substation.

¶ 9.     The civil division granted defendant's motion for summary judgment, reasoning that this Court had expressly declined to adopt the attractive-nuisance doctrine on multiple occasions and that the civil division was bound to follow those decisions.  Plaintiff timely appealed.[3]

---

[3]  Plaintiff, twelve years old at the time of the accident in 2013, filed suit in 2021.  Due to plaintiff's minority at the time of the incident, this was timely under the circumstances.  See 12 V.S.A. § 551 ("When a person entitled to bring an action specified in this chapter is a minor . . . such person may bring such action within the times in this chapter respectively limited, after the disability is removed."); 12 V.S.A. § 512(4) (requiring "causes [to] be commenced within three years after the cause of action accrues" for "injuries to the person suffered by the act or default of another person").

¶ 10.    Plaintiff renews his argument made to the trial court and urges this Court to adopt the attractive-nuisance doctrine as articulated in the Restatement (Second) of Torts § 339 (1965). He then asks that this Court remand for application of the doctrine to the facts of this case. Defendant urges this Court to maintain existing law regarding liability to trespassers and, alternatively, contends that even if the attractive-nuisance doctrine applied, the circumstances alleged in plaintiff's complaint do not meet the requirements of the doctrine for various reasons.

¶ 11.    "We review summary judgment rulings de novo, using the same standard as the trial court." Demag v. Better Power Equip., Inc., 2014 VT 78, ¶ 9, 197 Vt. 176, 102 A.3d 1101. "Summary judgment is appropriate only where, accepting the allegations of the nonmoving party as true, there exist no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Id.; see also V.R.C.P. 56(a).

¶ 12.    In the instant case, the parties do not contest that plaintiff was a trespasser and that, under Vermont's common law, defendant owed no duty to plaintiff. Consequently, the sole issue is whether this Court should change Vermont's common law to recognize the attractive-nuisance doctrine.

¶ 13.    In Demag v. Better Power Equipment, Inc., we articulated the appropriate analysis for this issue: we explained that when considering overruling precedent that has created "certainty, stability, and predictability" in our common law, this Court will only deviate from such precedent when "our community's ever-evolving circumstances and experiences" create "plain justification" to do so. 2014 VT 78, ¶ 14.

¶ 14.    Thus, we first consider our precedent and conclude that the common law on this issue has created certainty, stability, and predictability in the rule. For over 115 years, Vermont law has recognized that landowners, absent willful or wanton actions, are not liable to trespassers. See Bottum's Adm'r v. Hawks, 84 Vt. 370, 373-74, 79 A. 858, 865 (1911), abrogated on other grounds by Demag, 2014 VT 78. This Court has also explained that "this rule applies with equal

5

force to children and adults." Id. Indeed, since our decision in Bottum's Adm'r v. Hawks, this Court has not wavered from the position that "[o]ur rule is that the owner or occupant is under no obligation to a trespasser, whether adult or child, to protect him from injury by reason of the unsafe and dangerous condition of the premises." Trudo v. Lazarus, 116 Vt. 221, 223, 73 A.2d 306, 307 (1950); see also Coburn v. Vill. of Swanton, 94 Vt. 168, 171, 109 A. 854, 856 (1920) ("[T]he owner of private grounds is under no obligation to keep them in a safe condition for the benefit of trespassers." (quotation omitted)); Chicoine v. James E. Cashman, Inc., 108 Vt. 133, 134, 183 A. 487, 488 (1936) ("[A]s a general rule, an owner is under no legal obligation to trespassers . . . to keep his premises or property in proper condition; and this rule applies with equal force to children and adults." (quotation omitted)); Buzzell v. Jones, 151 Vt. 4, 6, 556 A.2d 106, 108 (1989) ("Under our well-established caselaw, a landowner generally owes no duty of care to a trespasser to protect him from injury caused by unsafe and dangerous conditions on the premises."); Demag, 2014 VT 78, ¶ 26 ("The rule as to trespassers . . . —that a landowner owes no duty to protect a trespasser from injury caused by unsafe or dangerous conditions—remains good law in Vermont." (quotation omitted)).

¶ 15. Furthermore, when specifically asked to adopt the attractive-nuisance doctrine, this Court has declined to do so and has, instead, reaffirmed the lack of a duty to trespassers in multiple cases. In Hawks, when the Court first considered whether to adopt the doctrine in 1911, it surveyed states in which the doctrine had been adopted and, conversely, where it had been "utterly rejected" and concluded that it was "impossible to justify the doctrine." 84 Vt. at 382-84, 79 A. at 865. The Court reasoned that the states which had adopted "the attractive nuisance doctrine . . . adopted a rule unknown to the common law, which, if carried to its logical conclusion, would make the ownership of property unduly unsafe, if not intolerable." Id. at 384, 79 A. at 865.

¶ 16. Subsequently, in this Court's 1950 decision Trudo v. Lazarus, this Court reaffirmed that "the so-called attractive nuisance doctrine is not recognized in this jurisdiction.". 116 Vt. at

6

223, 73 A.2d at 307. Similarly, a number of years later in 1996, this Court explained in Zukatis by Zukatis v. Perry that Vermont had not adopted the attractive-nuisance doctrine. 165 Vt. 298, 302, 682 A.2d 964, 966 (1996). Two years later, in Baisley v. Missisquoi Cemetery Ass'n, we once again explained that "[w]e have not adopted the doctrine of attractive nuisance, so the absence of duty applies to both adult and child trespassers." 167 Vt. at 477, 708 A.2d at 926.

¶ 17. Plaintiff asserts that this Court's prior decisions have not explicitly rejected the specific attractive-nuisance doctrine outlined in the Restatement (Second) on its merits. To be sure, two of our relevant precedents predated the publication of the second Restatement. Specifically, when this Court declined to adopt the attractive-nuisance doctrine in Hawks, neither the first nor second Restatement of Torts had been published. Compare Hawks, 84 Vt. at 385, 79 A. at 865 (opinion filed in 1911), with Restatement of Torts, Intro. (1934) (explaining first Restatement was published June 30, 1934). Similarly, this Court's discussion of the attractive-nuisance doctrine in Trudo was subsequent to the publication of the first Restatement but could not have considered the doctrine included in the Restatement (Second) of Torts because the second Restatement was published in 1965. Compare Trudo, 116 Vt. at 221, 73 A.2d at 306 (opinion filed in 1950), with Restatement (Second) of Torts, Intro. (1977) (explaining "Volumes 1 and 2 of the Restatement of law of Torts, published in 1934, were superseded in 1965 by the first two volumes of Restatement, Second").

¶ 18. Following the publication of the Restatement (Second) of Torts in 1965 however, multiple parties have asked this Court to adopt the doctrine, and this Court resolved the cases without reaching the issue. In Zukatis, we reasoned that the facts of that case precluded us from considering the issue because the plaintiff had "come forward with no facts from which a jury could reasonably infer a breach of" the duty that would be imposed on the landowner under the attractive-nuisance doctrine. 165 Vt. at 302, 682 A.2d at 966. Similarly, in Baisley, while we explained that "[w]e have not adopted the doctrine of attractive nuisance," we concluded that,

7

under the facts of that case, the doctrine was irrelevant. 167 Vt. at 477, 708 A.2d at 926. We explained that because the child in that case was impaled on a cemetery fence after falling from a tree located on neighboring property, he was, therefore, not a trespasser.[4] Id. at 477-78, 708 A.2d at 926. Accordingly, the Court determined that, for the purpose of the relevant analysis, the landowner had a duty of ordinary care to "keep [their] property from becoming a source of danger to [those on adjoining lands]." Id. at 478, 480, 708 A.2d at 928 (quotation omitted) (concluding child was owed "the duty applicable to a person who is on abutting land"). Contrary to plaintiff's implied argument here, we decline to interpret our judicial restraint in the cases cited above as a deviation from the certainty, stability, and predictability that our common law rule on this issue has created. See In re Constitutionality of House Bill 88, 115 Vt. 524, 529, 64 A.2d 169, 172 (1949) (instructing that this Court will not render advisory opinions).

¶ 19. We now turn to plaintiff's argument that, despite the strong incentive to honor stare decisis, "plain justification" exists to adopt the attractive-nuisance doctrine. Demag, 2014 VT 78, ¶ 14. Plaintiff claims that adoption of the attractive-nuisance doctrine in the majority of other states is "strong evidence that common standards have evolved" such that Vermont common law should also be modified.[5] We conclude that plaintiff misinterprets the relevant considerations for modification of Vermont common law.

----

[4] The Baisley Court acknowledged that the child at issue in the case could "technically" be considered a trespasser, stating: "[i]f the person who touches a boundary fence is a trespasser, it is only in the most technical sense." 167 Vt. at 478, 708 A.2d at 927. Nonetheless, in lieu of adopting the attractive-nuisance doctrine, the Court elected not to "consider[] whether to modify landowner liability rules generally," reasoning that a landowner's duty in the situation presented by the facts of the case was appropriate because "[t]he burden of making a boundary fence safe [was] not unreasonable." Id.

[5] When published, the Restatement (Second) of Torts § 339 (1965) explained that all but seven states had adopted the attractive-nuisance doctrine through common law or legislation. Restatement (Second) of Torts § 339 cmt. b (1965). Following publication of the second Restatement, some additional states also adopted the doctrine. See, e.g., Jones v. Billings, 289 A.2d 39, 42 (Me. 1972) (adopting attractive-nuisance doctrine in Maine); Haddad v. First Nat'l Stores, Inc., 280 A.2d 93 (R.I. 1971) (adopting attractive-nuisance doctrine in Rhode Island). In

¶ 20.    Namely, in Demag, we specified that the required "plain justification" must be derived from Vermont community standards and not those in existence in other states.  2014 VT 78, ¶ 14 (using "our community's . . . circumstances and experiences" to qualify type of justification needed and pointing to evolution in Vermont as "plain justification" for overturning distinction between licensees and invitees).  Here, plaintiff has replaced the vital argument about Vermont community standards with one concerning the "common" standards as defined by other state courts and legislatures.[6]

¶ 21.    Indeed, the reasoning articulated in Demag highlights this critical distinction.  In Demag, to determine if a plain justification existed to remove the distinction between licensees and invitees, this Court considered "the bases for the licensee-invitee distinction in Vermont and whether these reasons still appl[ied]."  Id. ¶ 17.  We acknowledged that "a slight majority of state courts [had] abolished the distinction between licensees and invitees" and stated that "[t]his history is strong evidence that common standards have evolved."  Id. ¶ 16.  We noted, however, that it was necessary to examine "the bases for the licensee-invitee distinction in Vermont" specifically to determine "whether these reasons still apply."  Id. ¶ 17.  In so doing, we considered the basis for the common-law distinction between invitees and licensees in Vermont case law, the rising

_____

2012, however, the Restatement (Second) of Torts (1965) was superseded by the Restatement (Third) of Torts (2012).  This third version of the Restatement does not include the attractive-nuisance doctrine but includes some overlapping considerations in § 51.  See Restatement (Third) of Torts § 51 (2012).  Some states have adopted the approach analogous to the one outlined in the third Restatement.  See, e.g., Basso v. Miller, 352 N.E.2d 868 (N.Y. 1976) (adopting analysis aligned with Restatement (Third) in New York).

[6] It is true that this Court has considered reasoning and rules adopted by other states.  See, e.g., State v. Roberts, 2024 VT 32, ¶ 26, 219 Vt. 414, 323 A.3d 928 (abolishing longstanding rule, and including, amongst other reasons, that rule had been "abolished in the vast majority of jurisdictions . . . to have addressed the issue").  The majority rule in such situations, however, is not dispositive of this Court's analysis or conclusions.  See, e.g., State v. Morris, 165 Vt. 111, 122, 680 A.2d 90, 98 (1996) (adopting minority analysis that people reasonably expect privacy from government search of trash); Ferguson v. Town of Sheffield, 52 Vt. 77, 83 (1879) (declining to adopt rule, reasoning "we do not feel bound to borrow [rule] from our neighbors, if they have such a[] one").

complexities in Vermont cases involving the invitee-licensee distinction, and Vermont public opinion on the issue. Id. ¶¶ 22-23.

¶ 22. Accordingly, contrary to plaintiff's suggestion otherwise, our decision on whether to overrule Vermont precedent is ultimately based upon Vermont community standards. Id. ¶ 14; see also Zeno-Ethridge v. Comcast Corp., 2024 VT 16, ¶¶ 9-15, 219 Vt. 121, 315 A.3d 978 (declining to modify Vermont's common law for negligent-infliction-of-emotional-distress claims because Vermont's community circumstances and experiences demonstrated policy reasons for common-law rule were still relevant in Vermont). Applying this analysis, we conclude that plaintiff has not demonstrated a "plain justification" for altering our common law on landowner liability to trespassers. Instead, a review of the common law on the issue, and especially legislation that is based upon the common law's rule, leads us to the conclusion that if there is to be a change to this law, it should be a change made by the Legislature. See Haupt v. Triggs, 2022 VT 61, ¶ 9, 217 Vt. 382, 295 A.3d 845 (explaining "we are not inclined to weigh the comparative merits of competing public-policy arguments, which is a matter best left to the Legislature" and "prefer[] not to substitute judicial fiat for legislative action" (quotation omitted)).

¶ 23. The current law—constitutional, legislative, and common law—surrounding public access to private land and correlated reductions in landowner liability demonstrates significant public-policy justification for maintaining the status quo. Doing so provides predictability for landowners regarding liability to trespassers and also maintains the assumptions regarding owed duties that underpin the Legislature's statutory scheme encouraging public access to private lands throughout the state.

¶ 24. Based on the existing common-law duties, the Legislature has provided and encouraged an expansive trail network throughout Vermont. See 10 V.S.A. §§ 441-449. These statutes were enacted with the intent "to provide access to the use and enjoyment of the outdoor areas of Vermont" notwithstanding public and private boundaries. 10 V.S.A. § 441 (explaining

10

intent "that trails be established <u>within and without</u> boundaries of State parks and forests" (emphasis added)). Similarly, in 1997, the Recreational Use Statute, 12 V.S.A. §§ 5791-5795, was enacted with the purpose of "encourag[ing] owners to make their land and water available to the public for no consideration for recreational uses." 12 V.S.A. § 5791; see also <u>In re Brewster River Mountain Bike Club, Inc.</u>, 2025 VT 4, ¶ 18, 220 Vt. 485, 331 A.3d 1039 ("Vermont law explicitly encourages landowners to make their land available to members of the public for recreational use.").[7]

¶ 25.    This clear legislative and constitutional desire to support public access to private land in Vermont could not exist without protection against liability for land possessors who open their land to the public. Indeed, in <u>Crogan v. Pine Bluff Estates</u>, we explained that the Recreational Use Statute established "a tradeoff to promote recreational use of private lands by the general public" because "landowners will benefit from limited liability for injuries resulting from recreational use of their land left open to members of the public for such use." 2021 VT 42, ¶ 21, 215 Vt. 50, 257 A.3d 247 (collecting cases explaining "quid pro quo" that landowners receive special statutory grant of qualified immunity from suit by recreational users in exchange for opening lands for recreational use). Further, in 12 V.S.A. § 5791, the Legislature acknowledged that the purpose of the Recreational Use Statute could only be effectuated by generally exempting landowners from liability. See 1997, No. 110 (Adj. Sess.), § 2 ("This act shall be liberally construed to accomplish the purpose set forth in Sec. 1 (12 V.S.A. § 5791) to limit an owner's liability and shall not be construed to extend an owner's liability beyond that which would exist if this act had not been adopted."). Section 5791 states that:

---

[7] We would be remiss not to also note that from the inception of Vermont's Constitution in 1793, our Constitution has also ensured that "[t]he inhabitants of this State shall have liberty in seasonable times, to hunt and fowl on the lands they hold, and on other lands not inclosed." Vt. Const. ch. II, § 67. If landowners so choose, they may enclose their land but bear the burden of meeting significant requirements to do so. See 10 V.S.A. § 5201 (setting forth requirements for posting land against hunting without permission).

> The purpose of this chapter is to encourage owners to make their land and water available to the public for no consideration for recreational uses by clearly establishing a rule that an <u>owner shall have no greater duty of care to a person who, without consideration, enters or goes upon the owner's land for a recreational use than the owner would have to a trespasser</u>.

(emphasis added).

¶ 26. Similarly, under the trail statutes, the Legislature balanced private access to trails on public lands by ensuring that "[n]o public or private owner of land that is a part of the Vermont trails system shall be liable for any property damage or personal injury sustained by any person using these trails unless the public or private owner intentionally inflicts the damage or injury." 10 V.S.A. § 448.

¶ 27. Consequently, we recognize that any modification to our common-law rule regarding landowner liability to trespassers, children or otherwise, could have significant impact upon and drastically alter the deliberate balance established by the Legislature to support public access to private land developed in these statutes. In fact, a review of cases from states which have adopted comparable recreational-use statutes in addition to the attractive-nuisance doctrine demonstrates that there is no consensus of how the two interact. See, e.g., <u>Stanley v. Tilcon Maine, Inc.</u>, 541 A.2d 951, 953 (Me. 1988) (holding recreational-use statute precludes liability in face of attractive nuisance); <u>Jacobsen v. City of Rathdrum</u>, 766 P.2d 736, 739 (Idaho 1988) (explaining "the recreational use statute does not preclude the liability of a landowner under this doctrine").

¶ 28. Plaintiff also raises public-policy considerations supporting adoption of the doctrine. Plaintiff points out that—in contexts separate from those addressing landowner liability to trespassers—"this Court has recognized reasons to treat children differently from adults based on their relative inexperience and lack of maturity." Analogizing those situations to the issue here, plaintiff asks the Court to examine landowners' duty to child trespassers and decide that they "are a class of persons that are owed the duty of care."

¶ 29. When other states have considered a similar question, a policy consideration behind adopting the attractive-nuisance doctrine has been additional protection for trespassing children who cannot fully appreciate the risk of artificial conditions. See, e.g., Billings, 289 A.2d at 43 (adopting attractive-nuisance doctrine and reasoning that decision was supported by "the legitimate interests of children too immature to appreciate and guard against dangerous conditions which present an unreasonable risk of death or serious bodily harm"). We do not discount that consideration here. However, in the face of other competing policy considerations, we conclude that it does not rise to the level of "plain justification" required to overturn our longstanding precedent through judicial order. We so conclude with the understanding that comparable protections for children and incentives for landowners to secure artificial conditions are not absent in Vermont. In fact, many local ordinances and municipal regulations have directly addressed this issue.[8]

---

[8] See, e.g., Burlington Code of Ordinances, ch. 18, art. 3, § 18-19(g)(2), https://www.codepublishing.com/VT/Burlington/#!/Burlington18/Burlington1802.html [https://perma.cc/UK5W-UMCD] ("Any physical condition, use or occupancy of any dwelling or its appurtenances is considered an attractive nuisance to children, including, but not limited to, abandoned wells, shafts, basements, excavations and unsafe fences or structures."); id. § 18-19(g) (requiring conditions listed, including (g)(2), to be corrected before issuing certificate of compliance); Code of Ordinances of City of Montpelier, ch. 7, art. 7, § 7-702(a), https://library.municode.com/vt/montpelier/codes/code_of_ordinances?nodeId=CH7HESA_ARTVIINU_S7-702PR [https://perma.cc/C7LZ-VRT6] ("No person shall create, operate or maintain a public nuisance within the City."); id. § 7-701(1)(b) (defining "nuisance" and "public nuisance" to include "[a]ny physical condition or occupancy of any premises or property considered an attractive nuisance to children, including, but not limited to, abandoned wells, shafts, basements, excavations, and unsafe fences and structures."); St. Johnsbury Code of Civil Ordinances, ch. 6, art. 1, § 6-5(m), https://docs.stjvt.com/index.php/governing-documents/code-of-civil-ordinance/390-code-of-civil-ordinance-master-07-12-19/file [https://perma.cc/7TTP-MBTH] ("All properties located in the Town of St. Johnsbury . . . shall not cause any hazardous condition or threat to the public health or safety."); id. § 6-4(e)(4) (defining "hazardous condition" in part as "[t]he placement of appliances, cars, and other objects that might constitute an attractive nuisance to children"); Dangerous and Vacant Building and Property Ordinance Town and Village of Woodstock, § 6(M), https://www.townofwoodstock.org/fileadmin/files/Archive/2020/01/Final-Town-of-Woodstock-Dangerous-Building-and-Property-Ordinance-.pdf [https://perma.cc/G29S-28PU] ("All real property located in Town and Village . . . shall not cause any hazardous condition or threat to the public health or safety."); id. § 4(C) (defining "hazardous conditions" to include "attractive nuisance to children"); Manchester Town Ordinance, ch. 16, § 16-3, https://drive.

¶ 30. Where, as here, there are "comparative merits of competing public-policy arguments," to adjust the current law is "a matter best left to the Legislature." Haupt, 2022 VT 61, ¶ 9; see also Wesco, Inc. v. Sorrell, 2004 VT 102, ¶ 24, 177 Vt. 287, 865 A.2d 350 (explaining where there exists "delicate balance inherent in the[] competing interests" at issue, changes to the law are "and remain[], a legislative prerogative"). Accordingly, "it is precisely because we recognize the compelling policy considerations both in favor of and against" the attractive-nuisance doctrine "that we choose to leave this decision to the [L]egislature." diMonda v. Lincoln Nat'l Corp., 2025 VT 45, ¶ 31, __ Vt. __, 350 A.3d 344; see also Herring v. Christensen, 249 A.2d 718, 719 (Md. 1969) (declining to adopt attractive-nuisance doctrine in Maryland, reasoning "[i]n our view the rule . . . is too firmly established and has been too long unchanged by the Legislature in the face of repeated reminders of its role in the matter in the opinions of the Courts to be changed judicially, assuming that it should be changed at all" and concluding "[i]f there is to be a change, we think the Legislature should make it").

¶ 31. For over a century, our no-duty-to-trespassers law has harbored certainty, stability, and predictability within Vermont's landowner liability law. Given the doctrine's integration into

google.com/file/d/0B_Hetl3gCvdkZEMtRDdialNxZHpSaXlKbVdfQTV1ZmdmeEIw/view? resourcekey=0-zgV2XxZSV5tjCN86ESsk4Q [https://perma.cc/5AYQ-T9SJ] (defining "hazardous conditions" to include "placement of appliances, cars, and other objects that might constitute an attractive nuisance to children"); id. § 16-4 (requiring public safety hazards to be "promptly . . . made safe"); Town of Royalton, Health and Sanitation Nuisance Ordinance, art. 2(1)(b), https://webgen1files1.revize.com/royaltonvt/Document_Center/Ordinances/Public-Health-Nuisance-Ordinance-7-14-2020.pdf?t=202207051542380&t=202207051542380 [https:// perma.cc/BG57-E88P] (defining "nuisance" and "public nuisance" in part as "any physical condition or occupancy of any premises or property considered an attractive nuisance to children, including, but not limited to, abandoned wells, shafts, basements, excavations, and unsafe fences and structures"); id. art. 3(1) ("No person shall create, operate or maintain a public nuisance within the Town."); Public Health and Safety Ordinance, Town of Swanton, § 3(F)(4), https://www. swantonvt.gov/fileadmin/files/town/Ordinances/Public_Health___Safety_Ordinance.pdf?630cac 4f0e5493d98f9bb690e2b85b8a9e49f87e [https://perma.cc/4WWS-SLLN] (defining "hazardous conditions" to include "[t]he placement of appliances, autos, trucks, or other motor vehicles, and other objects that might constitute an attractive nuisance to children"); id. § 7 (explaining abatement action if property is found to have "hazardous conditions" upon inspection).

our Vermont community's circumstances and experiences, and the complex and far-reaching policy considerations both supporting and opposing any change in Vermont, we decline to adopt the attractive-nuisance doctrine by judicial fiat. See Marshall v. Town of Brattleboro, 121 Vt. 417, 424, 160 A.2d 762, 767 (1960) (declining to overturn precedent, reasoning 110-year-old doctrine had "become so firmly established in our law that it [could not] be lightly set aside"). Accordingly, we reaffirm that under Vermont's common law, absent willful or wanton conduct, "[o]ur rule is that the owner or occupant is under no obligation to [protect] a trespasser, whether adult or child," from injury by reason of the claimed unsafe and dangerous condition of the premises. Trudo, 116 Vt. at 223, 73 A.2d at 307.

Affirmed.

FOR THE COURT:

_____

Associate Justice

15